THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* MARY J. TERRELL, Plaintiff in Error.

*Opinion filed February 21, 1914.*

1. CRIMINAL LAW—*rule as to evidence of dangerous character of deceased.* If the defendant in a homicide case first establishes that she was assailed by the deceased and was in apparent danger, she may prove that the deceased was a person of ferocity, brutality, vindictiveness or excessive strength, for the purpose of showing that she was acting in terror, and hence incapable of specific malice, or that she was in such apparent extremity as to make out a case of self-defense, or that the purpose of deceased in encountering the defendant was deadly.

2. SAME—*rule as to evidence of threats is the same as in regard to character of deceased.* The rule in regard to evidence of threats by the deceased is the same as that in regard to his character, and unless there is evidence that the deceased was the assailant, proof of threats against the defendant or members of her family is properly denied admission.

3. SAME—*mere threats, unaccompanied by any overt act, do not justify homicide.* Before one may attack or inflict bodily harm upon a person who has made threats against her, however well grounded her apprehension may be, there must be some overt act from which it may reasonably be inferred that there is an intention to carry the threats into effect and that the danger is imminent.

4. SAME—*when objection should not be sustained to entire answer of the defendant.* On the trial of a woman for shooting her husband as he was approching his house, an objection to the defendant's statement, in answer to a question as to what the deceased did, that "he lunged at me as though he would draw a revolver from his pocket," should be sustained only to that part giving the defendant's impression that deceased acted "as though he would draw a revolver from his pocket," as her statement that her husband lunged at her is competent.

5. SAME—*whether the defendant was prejudiced by rejection of testimony is determined by the whole record.* Whether the defendant was prejudiced by the improper rejection of part of a statement by her must be determined by a consideration of the whole record, and if the rejected statement could not reasonably have affected the verdict its exclusion is not reversible error.

6. SAME—*when it is not error to give instruction directing jury to find the defendant guilty of murder.* If the facts hypothetically

stated in an instruction constitute the crime of murder, it is not error to instruct the jury to find defendant guilty of murder if they believe the facts so stated have been proved by the evidence beyond a reasonable doubt. (*Crowell* v. *People,* 190 Ill. 508, followed.)

7. SAME—*credibility of witnesses not to be judged by "surrounding circumstances appearing on the trial."* An instruction upon the subject of determining the credibility of witnesses should not contain the statement that the jury may, upon such question, consider "surrounding circumstances appearing on the trial," but the inclusion of such statement will not be ground for reversal where there is no reasonable doubt of the guilt of the defendant.

WRIT OF ERROR to the Circuit Court of Montgomery county; the Hon. THOMAS M. JETT, Judge, presiding.

JOHN E. HOGAN, and HILL & BULLINGTON, for plaintiff in error.

P. J. LUCEY, Attorney General, J. EARL MAJOR, State's Attorney, and GEORGE P. RAMSEY, (THOMAS A. GASSAWAY, of counsel,) for the People.

Mr. JUSTICE DUNN delivered the opinion of the court:

The plaintiff in error having shot and killed her husband, Fred W. Terrell, was indicted for murder, and having been convicted and sentenced to fourteen years' imprisonment in the penitentiary has sued out this writ of error to review the record.

The plaintiff in error, who was fifty-three years old at the time of the homicide, had been married to a man named Barnstable, from whom she was divorced, and on December 24, 1907, she married Fred W. Terrell, with whom she lived until his death. They were then living at Nokomis, which had been their home most of the time since their marriage, and their family consisted, besides themselves, of her sons, Ed and Clarence Barnstable, aged, respectively, twenty-one and eighteen years, her daughter, Lillie, and a

child of the latter. Their home was situated in the south-west part of the town, on the west side of a north and south street, and the house sat back about forty feet from the sidewalk. No fence separated the lot from the street. There was a concrete sidewalk, and a walk of the same material extended from the sidewalk to the house. About six o'clock in the evening of August 7, 1912, Terrell, the deceased, approached his home, walking south on the west side of the street, coming from the direction of the ice plant, where he had been at work. He carried his dinner pail in one hand. Mrs. Terrell, who had been a few minutes before sitting on the porch in front of the house, was standing on the porch when he was about twenty feet from the walk leading to the house, with a revolver in her hand, and called to him in a loud voice, repeatedly, to go back where he came from and not to come in there. Terrell continued to walk south, and Mrs. Terrell ran down the steps from the porch to the walk, fired the revolver into the air and started down the walk. As Terrell reached the walk down which Mrs. Terrell was coming he turned around, facing the north, and she fired a second shot, which passed through the back part of his left arm near the shoulder and entered his body. He fell on his left side, dead, his feet on the sidewalk and his body partly on and partly at the side of the walk leading to the house.

It is argued that the court erred in the rejection of evidence offered by the plaintiff in error and in the giving and refusing of instructions, and that the verdict is contrary to the law and the evidence.

It is claimed that the plaintiff in error was justified in taking the life of the deceased by the apparent danger of death or great bodily injury to herself or her family, particularly her son Ed. The plaintiff in error testified that trouble between herself and her husband began soon after their marriage, occasioned by his inhuman abuse of her, and that he always cursed and called her vile names; that

he threatened many times to kill her and the whole family, and was particularly violent and profane in his threats against her son Ed; that the night before his death he repeated his abuse of her and his profane threats to kill the whole family. She is corroborated as to these statements by her sons and daughter. On the morning of August 7 she got up at four o'clock, got her husband's breakfast and called him to it about five o'clock, but he told her to put it in his bucket with his dinner and he would eat it at the ice plant, where he was at work. The next time she saw him, she says, was at the ice plant, between four and five o'clock in the afternoon. He had recently procured a patent, and she told him that her attorney had told her that he was getting money on it right along, and she had come to see if she could get any satisfaction out of him for the way he was doing. She told him she was almost crazy with trouble and what he said he would do when he got the money on the patent, but he cursed her and told her it was none of her business and repeated his profane threat to kill Ed. She said she was only at the ice plant once that day, and that when she returned home she sat on the porch a few minutes. When she saw her husband coming he was walking fast,—almost running. She went into the house and got the revolver, which belonged to her daughter. When she warned him not to come in he looked up and said something which she did not understand but which her daughter testified was "God damn this place." She fired in the air to frighten him and had no recollection of the second shot. She testified that her husband had a revolver, which he habitually carried in his right-hand coat pocket, and that when she fired she was in danger of receiving great bodily harm at his hands or of being killed. She is corroborated by her daughter and her son Ed as to most of what occurred at the time of the shooting. She is contradicted as to the fact of her husband's almost running, by disinterested witnesses who saw him and said he

was walking at an ordinary gait and who noticed nothing unusual in his actions or appearance. No revolver was found on his person, but no examination of his clothing was made for five or six hours. He was not facing the plaintiff in error when he was shot. He was not going toward her and was not on the walk leading to the house, for he was shot in the back, the bullet entering at the back of the left shoulder, and his feet were still on the sidewalk after he was dead, his body extending toward the house. Whatever threats he may have made, there is no evidence that he had then any intention of carrying them out or that he was then contemplating any violence, or that there was any apparent reason for apprehension on the part of the plaintiff in error that she or any member of her family was in danger of death or of receiving great bodily harm from him.

The plaintiff in error offered to prove by several witnesses threats made by the deceased to kill Ed Barnstable, the defendant's son, at various times in 1911 and 1912, but an objection by the People was sustained. This evidence was offered immediately after the evidence for the prosecution was closed, and no evidence had then been offered which in any way tended to show an attack, or intended attack, either upon the plaintiff in error or her son by the deceased. The objection was sustained for that reason, the judge saying that it was not then sought to show that the plaintiff in error was then undertaking to defend any attack made upon any member of her family and that the evidence at that time was not admissible; that if he concluded it was proper he would permit the witness to be recalled at a later time. The testimony was not again offered. In homicide cases, when it is sought to show that the deceased was a dangerous, vicious man, the rule is that "it is admissible for the defendant, after having first established that he was assailed by the deceased and in apparent danger, to prove that the deceased was a person of

ferocity, brutality, vindictiveness and excessive strength, such evidence being offered for the purpose of showing either (1) that the defendant was acting in terror and hence incapable of that specific malice necessary to constitute murder in the first degree, or (2) that he was in such apparent extremity as to make out a case of self-defense, or (3) that the deceased's purpose in encountering the defendant was deadly." (Wharton on Crim. Evidence, sec. 84.) In *Cannon* v. *People*, 141 Ill. 270, the court, after quoting this statement of Wharton, said (p. 281): "When evidence is submitted from which the court can see that the jury may, if they give it credence, find that the party killed was the assailant and that the defendant acted in self-defense, such evidence becomes admissible, as tending to show the circumstances by which the defendant was surrounded and the extent of the apparent danger to his life or person, and from which he might be justified in believing that his life was in danger or that he was in danger of suffering great bodily harm at the hands of the assailant, and illustrating to the jury the motive by which he was influenced. It appears, however, that the evidence was offered before the defendant testified, and was rejected, and that it was not again offered after his testimony. At the time it was offered there was no evidence showing that the deceased was the assailant and the evidence was then properly excluded. If the defendant desired the evidence to go to the jury it should have been offered after the introduction of the evidence tending to show the assault by the deceased." The same rule of law was applied in *Carle* v. *People*, 200 Ill. 494.

The rule in regard to threats is the same as that in regard to character. Although threats may have been made against a person's life, such person may not attack or take the life of the person making the threats when no act has been done indicating a purpose to carry the threats into execution. Before one may attack or inflict bodily harm

upon a person who has made threats against him, however
well grounded his apprehension may be, there must be some
overt act from which it may be reasonably inferred that
there is an intention to carry into effect the threats and
that the danger is imminent. (*Cummins* v. *Crawford,* 88
Ill. 312; *Wilson* v. *People,* 94 id. 299; *Forbes* v. *Snyder,*
id. 374; *Leigh* v. *People,* 113 id. 372; *Gilmore* v. *People,*
124 id. 380; *Price* v. *People,* 131 id. 223.) Even after all
the testimony in behalf of the plaintiff in error was heard
there was no evidence of any such overt act on the part
of the deceased as would have made proof of these threats
admissible. The utmost extent to which the testimony for
the defendant went was to show that the deceased was com-
ing home at supper time, walking fast, with his dinner pail
on his arm and with his right hand in his coat pocket; that
he was in the habit of carrying a revolver in that pocket,
and that when his wife called to him to go back and not
come in there he replied, "God damn this place," and kept
on his way. Mrs. Terrell and her three children had tes-
tified to frequent similar threats, and Mrs. Terrell testified
to a repetition of them when she visited the ice plant in
the afternoon. The fact that they testified to them did not
make proof of other like threats inadmissible if such proof
was otherwise competent. But this testimony shows no
reason to apprehend danger of violence. The deceased was
coming to his home, where he had a right to come, at the
usual time and with nothing unusual in his appearance or
action, unless he was walking faster than usual. No re-
volver was found on his person, but even if he had been in
the habit of carrying one in his pocket, the fact that he
had his hand in his pocket also did not justify the plaintiff
in error in acting upon the supposition that he intended to
attack anyone. Judging from the testimony of the family
as to occurrences in the household, his reply to her demand
that he go back and do not come in there was not couched
in language unusual or calculated to inspire terror in that

family. There was no foundation in the evidence, at any time, for the admission of testimony as to threats by the deceased.

Complaint is made of the sustaining of an objection to a part of the examination of the plaintiff in error. During her account of the circumstances immediately preceding the shooting she stated that she told Terrell not to come in there four times, and was then asked, "What did he do?" She answered, "He just kept on towards me, and the last time when I called I said, 'I told you not to come in here,' he lunged at me as though he would draw his revolver from his pocket." On motion of the People this answer was stricken out. This should not have been done, for the answer was competent except the conclusion, "as though he would draw his revolver from his pocket." The motion should have been limited to this part of the answer. On cross-examination she was asked the same question, "Then what did he do?" and she answered, "Lunged at me as though he would pull his hand from his pocket,—as though he would shoot us; I fully expected him to do it." Upon a disclaimer of the last part of the answer by the People without stating how much was disclaimed, the answer was stricken. This, also, was improper, for the answer that he lunged at her was competent. At the time she says this occurred she had been standing on the porch with the revolver in her hand, loudly and repeatedly warning her husband not to come in, and had then, still with the revolver in her hand, run down off the porch and on the walk toward him. Whatever indications existed at that time, according to her own testimony, were of an assault by her on him rather than by him on her. It is true that she ought to have been permitted to give her version of the affair, and that whatever may be thought as to the truth of it does not affect its competency, but in determining whether she was prejudiced by the rejection of the testimony, so as to require a reversal of the judgment, we will look at the

whole record, and in this case the rejected testimony could not reasonably have affected the verdict.

Objection is made to instruction No. 10 given for the People, which was as follows :

"The court instructs the jury that if you believe from the evidence in this case, beyond a reasonable doubt, that the defendant, with malice aforethought, either express or implied, inflicted upon the deceased, Fred W. Terrell, the mortal wound in manner and form as charged in the indictment, and that the said Fred W. Terrell did then and there die from said mortal wound in manner and form as charged in the indictment, then the jury may find the defendant guilty of murder, provided you further believe, beyond a reasonable doubt, that said mortal wound was not inflicted upon the deceased by the defendant in self-defense."

The cases of *Panton* v. *People,* 114 Ill. 505, *Lynn* v. *People,* 170 id. 527, and *Steiner* v. *People,* 187 id. 244, are cited as condemning an instruction directing the jury to find a defendant guilty of murder. It was shown in *Crowell* v. *People,* 190 Ill. 508, that these cases did not hold it to be error to give an instruction reciting every essential fact necessary to constitute the crime of murder and directing the jury to find the defendant guilty of murder if they believed the facts recited to have been proved beyond a reasonable doubt, and in *Carle* v. *People, supra,* an instruction was approved which was substantially the same as that now under consideration. If the facts hypothetically stated in an instruction constitute the crime of murder and are proved by the evidence beyond a reasonable doubt the jury should find the defendant guilty of murder, and it is not error to so instruct them. *Kyle* v. *People,* 215 Ill. 250; *Koser* v. *People,* 224 id. 201; *Bleich* v. *People,* 227 id. 80.

The fifteenth instruction is identical with that set out in the case of *Doyle* v. *People,* 147 Ill. 394, and it was not error to give it.

The sixteenth instruction is the same as the third instruction given in the case of *Hirschman* v. *People,* 101 Ill. 568, and has been approved in many cases since. *People* v. *Harrison,* 261 Ill. 517.

The seventeenth instruction is as follows:

"The court instructs the jury that the credibility of witnesses is a question exclusively for the jury, and the law is, that where a number of witnesses testify directly opposite to each other the jury are not bound to regard the weight of the evidence as evenly balanced. The jury have a right to determine, from the appearance of witnesses on the stand, their manner of testifying, their apparent candor and fairness, their apparent intelligence, and from all other surrounding circumstances appearing on the trial, which witnesses are the more worthy of credit and to give credit accordingly."

It is first insisted that the instruction is erroneous for assuming that a number of witnesses have testified directly opposite to each other. The assumption, if contained in the instruction, is justified by the record. We do not regard the instruction as referring particularly to the defendant. A more serious criticism is that the instruction authorizes the jury, in determining the credibility of the witnesses, to take into consideration all the "surrounding circumstances appearing on the trial." This clause is of doubtful meaning. It is proper for the jury to take into consideration the surrounding circumstances appearing from the evidence, but "circumstances appearing on the trial" might be taken to refer, not to circumstances surrounding the transactions testified about or circumstances shown by the evidence, but circumstances occurring at the trial and the conduct of the witnesses in the presence of the jury while they were not on the witness stand. This part of the instruction should have been omitted. It was held in *Purdy* v. *People,* 140 Ill. 46, *Vale* v. *People,* 161 id. 309, and *People* v. *McGinnis,* 234 id. 68, to be improper to tell the jury that they have

the right to take into consideration the demeanor and conduct of the defendant during the trial in determining his credibility. The reason extends also to the conduct of witnesses during the trial. If the guilt of the defendant were doubtful or the case not clear the giving of this instruction might require a reversal of the judgment, but upon this record there can be no reasonable doubt of the guilt of the defendant. We do not regard the error in this instruction or in the rejection of evidence of sufficient importance to require a reversal of the judgment, and it is therefore affirmed.

*Judgment affirmed.*