THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* LOUIS STAPF, Plaintiff in Error.

*Opinion filed February 16, 1927.*

CRIMINAL LAW—*when it is error to exclude evidence of threats against accused.* In a prosecution for murder, where there is no showing that the deceased was the assailant or that the accused was acting in self-defense at the time he fired the shot which killed the deceased, it is not error to exclude evidence of previous threats against the accused, but where the defendant has testified to facts indicating that when he fired the shot the deceased was in the act of getting a gun with which to shoot him it is error to exclude evidence of previous threats of the deceased, and in such case all the circumstances showing the relations of the parties should be submitted to the jury that they may intelligently judge the conduct of the accused.

WRIT OF ERROR to the Circuit Court of St. Clair county; the Hon. GEORGE A. CROW, Judge, presiding.

FARMER & KLINGEL, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, H. C. LINDAUER, State's Attorney, and MERRILL F. WEHMHOFF, (CURT C. LINDAUER, of counsel,) for the People.

Mr. JUSTICE THOMPSON delivered the opinion of the court:

Plaintiff in error, Louis Stapf, was charged by the grand jury of St. Clair county with the murder of Archie Harris and on trial was convicted of manslaughter. He prosecutes this writ of error to reverse the judgment, urging, principally, error in exclusion of evidence.

The testimony of the witnesses for the People showed an unprovoked and malicious homicide. The killing occurred in a cornfield on the farm of plaintiff in error on Sunday morning, October 18, 1925. Herman Matzenbacher, brother-in-law of the deceased, leased the farm in August, 1924, and moved there from Marissa. Plaintiff in error had trouble collecting his rent and had ordered Matzenbacher to leave the farm. Harris was a coal miner by occupation but for several weeks before the day of the trouble he had been living with Matzenbacher and helping him with the work on the farm. About eight o'clock in the morning Matzenbacher, his ten-year-old son, Harris and John Schroeder went to the field to husk a load of corn. The field was irregular in shape, contained about eight acres, and lay just north of Hazel creek. The rows of corn extended north and south. The men began at the south end, husked five rows through the field, turned, and were husking five rows along the west side of the field when plaintiff in error came into the field with his son. Schroeder was husking the two rows on the east side of the wagon, Harris

the two rows on the west side, and Matzenbacher and his son the down row. Plaintiff in error approached from the west, carrying a shot-gun. Matzenbacher says plaintiff in error walked up alongside the mules and asked him, "What are you doing in my cornfield?" that he replied, "This cornfield belongs to me;" that plaintiff in error said, "I am going to shoot you," and, looking at Harris, "I will shoot you too." With this remark plaintiff in error raised his gun and shot Harris. Matzenbacher, Schroeder and the boy ran from the field. Schroeder corroborates this version of the shooting. They notified the sheriff and then returned to the field, where they found Harris lying on his back behind the wagon, his feet toward the south. In his back was a wound about two inches in circumference. Examination of the body by the physicians showed that the wad and the charge of No. 6 shot had entered the body between the ninth and eleventh ribs and penetrated the lower part of the left lung.

According to the testimony of plaintiff in error he was fully warranted in assuming that it was necessary for him to kill Harris to save his own life. He was sixty-one years old and had lived on the farm where the trouble occurred from the time of his birth to the time he leased it to Matzenbacher. His son Otto lived on the farm immediately west. Hazel creek runs diagonally across the south end of these farms. Between them is a road, which crosses Hazel creek over a bridge about a mile from Otto's house. October 18, 1925, there was a cornfield of about twelve acres immediately east of this road and north of the creek. East of the cornfield was a plowed field, immediately east of which was the cornfield where the killing took place. Sunday morning plaintiff in error drove from his home at Mascoutah to his son's farm and about ten o'clock he started out with the son to look at a pasture on the south side of the creek. A short distance from the house plaintiff in error saw a hawk and returned to the house for his shot-

gun with which to kill the hawk. He got the gun and two or three shells and shot at the hawk. As he and his son went on toward the pasture he carried the gun with him. They could not see the cornfield from the house nor the road, and they did not know Harris and the other men were husking corn in the field until they had walked along Hazel creek through the twelve-acre cornfield to the plowed field immediately west of the field in which the killing occurred. As they came into the plowed field his son said, "There is somebody husking corn." They walked toward the men, and he says that as they approached he heard Matzenbacher say, "There comes the old son of a bitch;" that he approached the wagon, stopped, and said, "What are you doing here?" and that Matzenbacher replied, "Shucking corn; don't you see?" While these words were being exchanged Matzenbacher and his son were behind the wagon, Schroeder was on the east side of it and Harris on the west side, near the front end. When plaintiff in error told Matzenbacher that he had no right to take the corn, Matzenbacher walked toward the rear end of the wagon and put his hand over the side board. Plaintiff in error told him to take his hand out of the wagon. Matzenbacher obeyed, but as he did so he tapped two ears of corn together, apparently as a signal to Harris. Thereupon Harris indicated with an ear of corn that Matzenbacher was to leave, and Matzenbacher, Schroeder and the boy started to run from the field. Harris then turned to plaintiff in error and said, "You hurry up and get to hell out of here," putting his hand in the front pocket of his trousers and starting toward plaintiff in error. Plaintiff in error began to back away from Harris, saying, "Stay back." Harris then turned and walked toward the rear end of the wagon and reached into it. Plaintiff in error saw him lift something which looked like a gun, and he said to him, "Keep your hand out of the wagon." Harris turned toward him and then turned to the wagon again. Plaintiff in error repeated to Harris, "Keep

your hand out of the wagon," but Harris reached his right hand into the wagon, and as he started to lift something out of it plaintiff in error shot him. Harris staggered a couple of steps back of the wagon and fell. Otto Stapf corroborates this version of the shooting. Plaintiff in error says that after Harris had fallen he looked into the wagon and saw there a double-barreled shot-gun and a pump-gun.

On the trial plaintiff in error offered to prove that a distress warrant had been levied upon Matzenbacher's interest in the corn which he was husking at the time of the shooting; that a trial was had and that a judgment was rendered against Matzenbacher in favor of plaintiff in error and that the judgment had not been satisfied or the distress warrant released at the time of the trouble. He also offered to prove that on two occasions when he met Matzenbacher and Harris on the public highway they had deliberately driven their team and wagon in front of him so that he was crowded into the ditch; that after they had pushed him into the ditch Harris said, "What are you going to do now?" and that he made no reply and they laughed and drove on; that a short time before the trouble he took an officer to the farm to serve a paper on Matzenbacher, and that while the officer was busy Harris walked around his machine, whittling with a very long-bladed knife, and said to him, "What do you want here? You ain't got no business here;" that he did not reply; that later, when he was there attending a sale at which the constable was offering Matzenbacher's corn under an execution, Harris came up to him and said, "This corn belongs to me; I bought it, and anyone who bids on this corn is going to get into serious trouble;" that because of the indication of trouble the constable postponed the sale for ten days; that again Harris said to plaintiff in error, who had bought the corn, "I want to tell whoever attempts to take that corn is going to get himself into serious trouble;" that on the same day, when Harris first came up from the field,

he was carrying a pitchfork, and he walked around the automobile in which plaintiff in error was sitting, and, glaring at him, said, "I feel like sticking this fork into something here to-day;" that a few days before the killing the plaintiff in error was in the highway near the Hazel creek bridge and saw Matzenbacher and Harris husking the corn which he had purchased at the constable's sale; that he waited until the men reached the south end of the field; that he saw Matzenbacher and Schroeder each take a shotgun from the wagon and walk off through the timber; that Harris drove the loaded wagon out of the field onto the road and that he met him there and said, "Why are you taking that corn?" that Harris replied, "It is none of your damned business," and started to get off the wagon, saying, "If you don't get out of here and stay out I am going to get you;" that plaintiff in error went to his automobile and drove away; that a few days later he saw the same persons husking some more of the corn and again asked Harris why he was taking the corn; that Harris answered, "It is none of your damned business; and besides, I told you the other day to get out of here and stay out or I will get you."

When this evidence was first offered there was no showing that the deceased was the assailant or that the accused was acting in self-defense at the time he fired the shot, and the court properly excluded it. (*People* v. *Terrell,* 262 Ill. 138; *Cannon* v. *People,* 141 id. 270; 4 Elliott on Evidence, sec. 3041.) After plaintiff in error had testified to the facts indicating that when he fired the shot the deceased was in the act of getting a gun with which to shoot him the evidence became competent and it was error to refuse it when it was re-offered. It is uniformly held by the courts of this country that where the accused first establishes that he was assailed by the deceased and was in apparent danger of suffering great bodily injury or of losing his life it is competent for him to prove that the deceased had previ-

ously threatened him. (*Carle* v. *People,* 200 Ill. 494; *Walker* v. *People,* 133 id. 110; Wharton on Homicide,— 3d ed.—sec. 244; 1 Wigmore on Evidence,—2d ed.—sec. 247.) If plaintiff in error had been permitted to testify to these facts and the jury had believed that he had seen these men husking his corn and had been threatened with serious bodily injury if he undertook to interfere with their taking it and had seen shot-guns in their possession while they were taking the corn, then they would have had a picture of the circumstances surrounding the accused and the extent of the apparent danger to his life and person at the time and would have been able to better judge whether he was justified in concluding that it was necessary to kill in self-defense. It was also important for the jury to know whether plaintiff in error was rightfully in the field protesting against the taking of the corn by Matzenbacher and Harris. All the circumstances directly connected with the commission of a crime should be submitted to the jury so that they can intelligently judge the conduct of the accused.

Complaint is made of a number of the instructions. Some of them are inaccurate but no useful purpose will be served by re-stating the law of self-defense. This court has had occasion in a number of opinions to deal with instructions on this subject, (*People* v. *Scimeni,* 316 Ill. 591; *People* v. *Dugas,* 310 id. 291; *People* v. *Durand,* 307 id. 611; *People* v. *Stapleton,* 300 id. 471; *Campbell* v. *People,* 16 id. 17;) and what is said in them ought to be sufficient guide for the proper instruction of the jury on the next trial.

The judgment is reversed and the cause remanded to the circuit court of St. Clair county.

*Reversed and remanded.*